UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HELLER FINANCIAL LEASING, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>LTX CORPORATION,<br><br>    Defendant. | CIVIL ACTION NO. 04-12578-MLW |

MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

Plaintiff Heller Financial Leasing, Inc. ("HFL") submits this memorandum in support of its Motion to Dismiss the Counterclaim of defendant LTX Corporation ("LTX"), pursuant to Rule 12(b)(6), Fed. R. Civ. P.

SUMMARY

This action arises from LTX's failure to pay timely a $2 million balloon payment due on May 1, 2004, at the end of an equipment lease with HFL.  LTX asserts three counterclaims:  misrepresentation, breach of the implied covenant of good faith and fair dealing, and violation of Mass. Gen. Laws ch. 93A.  Each should be dismissed for failure to state a claim upon which relief may be granted.

As discussed below, the sole basis for each counterclaim is a vague, indefinite statement by an unidentified representative of HFL in late April 2004 that the parties "could" discuss delaying LTX's obligation to make the $2 million balloon payment due May 1, 2004.  The parties, however, never had such discussions -- much less reached an agreement -- and the alleged suggestion by HFL to have such discussions, or the alleged

prediction that it "could do something," are not actionable. Such statements are too vague and indefinite to justify reliance by LTX in not making the balloon payment, and they also are statements of opinion and/or predictions that are not actionable statements of existing fact.

## STATEMENT OF FACTS

HFL filed this action to enforce certain lease agreements executed by defendant LTX, as lessee, in favor of Matrix Funding Corporation ("MFC"), as lessor. See HFL's Complaint (the "Complaint"), generally.

HFL is a Delaware corporation with its principal place of business at 500 West Monroe Street, Chicago, Illinois. LTX is a Massachusetts corporation with its principal place of business at University Avenue, Westwood, Massachusetts. Complaint ¶¶ 1, 2; Answer ¶¶ 1, 2.

HFL has acquired MFC's rights as lessor under the lease agreements, as well as title to the equipment subject to the lease agreements, as described more fully in the Complaint. The lease agreements include Master Lease Agreement No. R0742 (the "Master Lease Agreement") (attached to the Complaint as Exhibit A), Lease Schedule No. 4A (attached to the Complaint as Exhibit C), and Lease Schedule No. 4B (attached to the Complaint as Exhibit D), and collectively will be referred to hereinafter as the "Lease Agreements." See Complaint ¶¶ 5-12; Answer ¶¶ 5-12.

LTX agreed, pursuant to Lease Schedule No. 4A and the Notice and Acknowledgement of Assignment of the Master Lease Agreement and Lease Schedule No. 4A (attached to the Complaint as Exhibit G) ("Notice of Assignment No. 4A"), to make quarterly rental payments in the amount of $360,000 for each of the first sixteen (16) quarters and one (1) quarterly rental payment in the amount of $900,000 for the

2

seventeenth (17th) and final quarter, due May 1, 2004.  See Lease Schedule No. 4A ¶ 5; Notice of Assignment No. 4A; Answer ¶¶ 12-13.

LTX further agreed, pursuant to Lease Schedule No. 4B and the Notice and Acknowledgement of Assignment of the Master Lease Agreement and Lease Schedule No. 4B (attached to the Complaint as Exhibit H) ("Notice of Assignment No. 4B"), to make quarterly rental payments in the amount of $440,000 for each of the first sixteen (16) quarters and one (1) quarterly rental payment in the amount of $1,100,000 for the seventeenth (17th) and final quarter, due May 1, 2004.  See Lease Schedule No. 4B ¶ 5; Notice of Assignment No. 4B; Answer ¶¶ 12-13.

In the event the quarterly rental payments were not made when due, LTX agreed to pay late charges (in the amount of twenty-five dollars ($25) or five percent (5%) of the unpaid amount, whichever is greater, up to the maximum extent permitted by law) and interest on the outstanding payments.  See Master Lease Agreement ¶ 4; Lease Schedules Nos. 4A and 4B (incorporating the terms of the Master Lease Agreement); Answer ¶ 14.

LTX's final quarterly rental payments under Lease Schedules Nos. 4A and 4B, totaling $2,000,000, were due on May 1, 2004.  See Complaint ¶¶ 18-19; Answer ¶¶ 18-19.  LTX did not make the final rental payments when due on May 1, 2004.  See Complaint ¶ 19; Answer ¶ 19.

On or about May 25, 2004, HFL notified LTX in writing of its failure to make its final quarterly rental payments due May 1, 2004, and demanded payment of the final quarterly rental payments and $180,000 then owing in late charges.  See Complaint ¶ 20; Answer ¶ 20.

LTX made its final rental payments, totaling $2,000,000, on May 28, 2004, but did not make payment of the late charges owed by LTX. See Complaint ¶ 21; Answer ¶ 21. HFL has still not received payment of the late charges owed by LTX. See Complaint ¶ 23; Answer ¶ 23. Thus, HFL commenced this action.

On December 22, 2004, LTX answered the Complaint and filed a Counterclaim against HFL. The Counterclaim alleges that in April 2004, "an employee of LTX contacted a representative of HFL and made inquiries concerning a possible extension of the final payment due under the leases on May 2004." See LTX's Counterclaim (the "Counterclaim") ¶ 3.

The Counterclaim alleges the following: On April 22, 2004, "a representative of HFL returned the call to the LTX employee and stated that HFL could do something to accommodate LTX's request for an extension and promised that someone from HFL would get back to LTX." Counterclaim ¶ 4.

LTX goes on to plead that "[r]elying on these statements from HFL's representative, LTX did not believe it was obligated to pay the final lease payment due on May 1 but instead would make the final payment after a mutually agreed extension date could be arranged." See Counterclaim ¶ 5. Then, according to LTX, on May 7, 2004, "a representative of HFL contacted LTX and demanded payment of the final lease payments. During this conversation, HFL's representative agreed to go back to HFL's management and request an extension of the payment date of the final lease payment and a waiver or reduction of any late fee." See Counterclaim ¶ 6. "Once again," LTX states, "relying on the representations from HFL's representative, LTX believed that it was excused from paying some or all of the late fees claimed by HFL and was not obligated

4

to pay the final lease payment at that time." See Counterclaim ¶ 7. Finally, LTX states that "[l]ater in May, HFL contacted LTX once again and stated that HFL would refuse to work any type of accommodation with LTX. As a result, LTX immediately paid in full the final payment of $2 million to HFL." See Counterclaim ¶ 8.

Paragraphs 18(n) and 19 of the Master Lease Agreement provide that "[t]he Lease may not be amended or modified except by a writing signed by a duly authorized representative of each party," and that "[n]o waiver or modification by Lessor of any of the terms and conditions hereof shall be effective unless in writing signed by an officer of Lessor." Count I of LTX's Counterclaim nevertheless alleges that HFL breached the implied covenant of good faith and fear dealing, "by leading LTX to believe that the final payment due under the leases would be extended beyond May 1 and then claiming penalties and late fees when the payment was not received by May 1." See Counterclaim ¶ 11. Count II of the Counterclaim alleges misrepresentation by HFL, adding to the allegations described above only as follows:

> Representatives of HFL represented that they could do something to accommodate LTX's request for an extension of the date when the final payment was due under the leases. LTX reasonably relied on this representation and did not make the final payment on May 1. Furthermore, LTX relied on the statement made by an HFL representative on May 7 and also did not make the final payment until later in the month based on HFL's representation that management would consider LTX's request for a later payment date and a waiver or reduction of any late fee. The statements made by HFL's representative were made with the intent to induce LTX not to make the final payment on May 1, 2004 and thus expose LTX to a claim for late fees.

See Counterclaim ¶¶ 14-16. Count III of the Counterclaim alleges that HFL has violated Chapter 93A of the Massachusetts General Laws, stating that "[t]he actions by the two

5

different representatives of HFL in inducing LTX not to make the final payment on the date due and then claim penalties and late fees as a result of LTX's reliance on those statements constitute unfair or deceptive acts or practices."

## ARGUMENT

I. THE ALLEGED STATEMENTS ARE NOT ACTIONABLE STATEMENTS ON WHICH LTX COULD JUSTIFIABLY RELY.

Count II of LTX's Counterclaim attempts to state a claim against HFL for misrepresentation, on the basis of two alleged statements by representatives of HFL: one on May 7, 2004, after the balloon payment was already due, and a prior statement, allegedly made on April 22, 2004. See Counterclaim ¶¶ 13-17. Nowhere in the Counterclaim does LTX identify the maker of the alleged statements. Even assuming the statements were made, and assuming the truth of the allegations contained in the Counterclaim, neither of these two statements constitutes an actionable misrepresentation.

The elements of a misrepresentation claim are the same, whether the Court applies Utah law which HFL submits should govern all of the claims in this action, or Massachusetts law. LTX must show that HFL made a false representation, concerning a presently existing material fact, which HFL knew to be false, for the purpose of inducing LTX to act upon it, and that LTX reasonably relied upon the statement to its injury. Dugan v. Jones, 615 P.2d 1239, 1246 (Utah 1980); Conder v. A.L. Williams & Assocs., 739 P.2d 634, 638 (Utah Ct. App. 1987); Rodowicz v. Massachusetts Mut. Life Ins. Co., 192 F.3d 162, 174-5 (1999) (Massachusetts law). Even assuming the truth of the allegations of the Counterclaim, LTX's allegations here fail to state a misrepresentation claim as a matter of law.

6

The alleged statement by a representative of HFL on May 7, 2004, described in ¶ 6 and ¶ 15 of the Counterclaim, was clearly made after May 1, 2004, the date on which LTX's final quarterly payment was due.  Therefore, this statement could not have been made "with the intent to induce LTX not to make the final payment on May 1," as LTX had already failed to make that payment.  For the same reason, the May 7 statement could not have been relied upon by LTX in deciding not to make the final payment on May 1, as that decision necessarily had already been made.  Simply put, the May 7 statement could not have been the cause of LTX's "expos[ure] to late fees," see Counterclaim ¶ 16, as the late charges incurred by LTX became due and owing as of May 2, 2004.  See Master Lease Agreement ¶ 4; Lease Schedule No. 4A, Lease Schedule No. 4B.

The only other statement alleged by LTX as the basis for its misrepresentation claim was allegedly made by a representative of HFL on April 22, 2004.  See Counterclaim ¶¶ 4, 14.  According to the Counterclaim, an unidentified HFL representative, returning a telephone call that was initiated by an employee of LTX, "stated that HFL could do something to accommodate LTX's request for an extension and promised that someone from HFL would get back to LTX."  LTX contends that it relied on this representation that HFL "could do something" in deciding not make the final $2 million balloon payment on May 1.  See Counterclaim ¶ 15.

This statement that "HFL" "could do something," even assuming it was made, is not actionable for two reasons.  First, LTX could not have reasonably or justifiably relied on such a vague and indefinite statement in deciding not to make the $2 million balloon payment.  The statement that HFL "could do something" was nothing more than an expression of opinion, or offer to negotiate a possible extension, and it neither stated that

7

HFL would waive the late fees nor stated any terms under which HFL would waive the late fees; indeed, the statement does not concern late fees whatsoever. By its very nature, in fact, the statement that HFL "could do something" begs the question: What could HFL do? Furthermore, what would LTX be required to do in exchange? When, in fact, would the payment be due? The statement does not address any of these points. As a matter of law, a statement as vague and as speculative as the one HFL allegedly made is not definite enough to justify reasonable reliance on the part of LTX. See Saxon Theatre Corp. of Boston v. Sage, 347 Mass. 662, 666-67 (1964) (applying Mass. Law) (plaintiff could not reasonably rely on a statement of intention to negotiate where the essential terms had not been stated or settled).

Further weakening the argument that LTX could justifiably rely on a suggestion that HFL "could do something" is the fact that the lease expressly states that no modification or waiver of the Lease Agreements by HFL would be effective absent a writing signed by a duly authorized representative of HFL. In such circumstances, no reasonable business person would have relied upon HFL's alleged oral statement that it "could do" some unspecified "thing" in deciding not to make a timely payment when due. After all, when May 1 came, LTX necessarily knew that, notwithstanding HFL's prediction that the parties "could" work something out, no agreement was in place.

Second, the April 22 statement that HFL "could do something" was not actionable because it falls under the general rule that only statements of existing fact are actionable. Statements of opinion, or promises or predictions about future events are not actionable. Rodowicz v. Massachusetts Mut. Life Ins. Co., 192 F.3d at 175 (Massachusetts law). The alleged statement by an unnamed HFL representative falls in the latter category.

Whatever else it is, the statement that HFL "could do something" is certainly not a statement of existing fact. At best, it is an expression of an opinion that the parties would be able to reach an agreement on an extension, or a prediction about the future, i.e., a prediction that the parties could negotiate an extension. Such expressions are not, as a matter of law, actionable as misrepresentations.

In response, LTX will likely contend that a promise, while not a statement of existing fact, is nevertheless actionable if the promisor does not have a present intent to perform. See e.g., Restatement (Second) of Torts, § 530; Starr v. Fordham, 420 Mass. 178, 187 (1995) (applying Mass. Law); Galloway v. Afco Dev. Corp., 777 P.2d 506, 508 (Utah Ct. App. 1989) (applying Utah law). But this exception to the general rule does not apply here. For the exception to apply, there must be a promise that the defendant did not intend to carry out. No such promise is alleged in the Complaint. At most, the vague statement that the HFL "could do something" was an opinion or prediction; it cannot be construed as a statement of a promise or definite intention which could be misrepresented. After all, what is it that HFL "could do," and what would LTX be required to do in exchange, i.e., when would the balloon payment be due and what would be the consideration for the extension?

The case of Saxon Theatre Corporation of Boston v. Sage, 347 Mass. 662 is directly on point. The plaintiff in that case claimed that the defendant had stated an intention to build a theater and give a long term lease to the plaintiff. When that did not happen, plaintiff sued the defendant for breach of contract and fraud. The trial court dismissed the fraud claims as a matter of law, on a demurrer, and the Massachusetts Supreme Judicial Court affirmed the dismissal, on two grounds. First, the Court said that

9

plaintiff was not justified in relying on the representation of an intention to give a lease, where the definite terms of such a lease depended upon negotiations that had not happened and, if they occurred, might not come to fruition. Second, the Court said that a stated intention to give a lease was not actionable, where the essential terms of the lease are missing, because without such terms there is no "meaningful intention" on the part of the party making the statement which can be misrepresented. 347 Mass. at 666-69.

The same rules apply here. As a matter of law, LTX could not rely on a statement that HFL would discuss an agreement to extend the deadline for the balloon payment; LTX did not know in advance what the outcome of such negotiations would be (e.g., would the parties' agree when the balloon payment was due, and would they agree on the consideration for the delay?). Furthermore, in and of itself, HFL's statement that it "could do something was neither a statement of fact nor a statement of an intention that could be misrepresented. See also King v. Nevada Elec. Inv. Co.., 1995 U.S. App. LEXIS 15369, *23-24 (No. 94-4122) (10th Cir. June 21, 1995) (holding, under Utah law, that where plaintiffs had proved only an "uncertain and indefinite promise," plaintiffs had failed to establish a promise or reasonable reliance on a promise); see also Armstrong, 2004 U.S. Dist. LEXIS 25129 at *25 ("Reliance is not reasonable where the alleged representations are vague or indefinite").

For these reasons, Count II of the Counterclaim fails to state a claim on which relief can be granted.

II.  COUNT I OF LTX'S COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

    A.  <u>Utah law governs LTX's claim for breach of the implied covenant of good faith and fair dealing</u>.

LTX's claim for breach of the implied covenant of good faith and fair dealing is governed by Utah law, pursuant to ¶ 18(d) of the Master Lease Agreement, which states in part: "[t]his lease shall in all respects be governed by and construed in accordance with the laws of the state of Utah, including all matters of construction, validity, and performance," and pursuant to Lease Schedules Nos. 4A and 4B, which incorporate the terms of the Master Lease Agreement. Such choice of law provisions are enforced in Massachusetts and Utah. See, e.g., Morris v. Watsco, Inc., 385 Mass. 672, 674-75 (1982) (Massachusetts); Prows v. Pinpoint Retail Sys., Inc., 868 P.2d 809, 810 (Utah 1993). Moreover, in transactions governed by the Uniform Commercial Code (such as the transaction evidenced by the Lease Agreements between LTX and HFL) which bear a reasonable relation both to Massachusetts and to another jurisdiction, Mass. Gen. Laws ch. 106, § 1-105(1) states that "the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." Id.

The parties' choice of law is therefore enforceable. As LTX's claim for breach of the implied covenant of good faith and fair dealing is a claim based on an implied provision of the Master Lease Agreement, the claim is within the ambit of the choice of law provision contained in the Master Lease Agreement, and is governed by the law of Utah. See Crookston v. Fire Ins. Exchange, 817 P.2d 789, 798 n.8 (Utah 1991) ("the covenant of good faith and fair dealing is an implied contractual provision, and a cause of action for its breach sounds in contract.").

11

  B. <u>LTX has failed to state a claim for breach of the implied covenant of good faith and fair dealing because HFL has not breached an express covenant.</u>

In Utah, the covenant of good faith and fair dealing is implied in contracts in order "to protect the express covenants or promises of the contract." <u>See</u> <u>Craner v. Northwestern Mut. Life Ins. Co.</u>, 12 F. Supp. 2d 1234, 1242 (D. Utah 1998) (quoting <u>Peterson v. Browning</u>, 832 P.2d 1280, 1284 (Utah 1992)).  Therefore, under Utah law, "where there is no breach of an express covenant in a contract, there can be no cause of action for breach of an implied covenant arising therefrom."  <u>See</u> <u>Craner</u>, 12 F. Supp. 2d at 1242; <u>see</u> also <u>Bower v. Stein Eriksen Lodge Owners Assoc., Inc.</u>, 201 F. Supp. 2d 1134, 1144 (D. Utah 2002) ("because [defendant] did not breach the contract that existed between [defendant and plaintiff], there is no breach of the covenant of good faith and fair dealing . . .").  LTX has not alleged that HFL has breached an express covenant of the Lease Agreements; therefore, it has not stated a claim for breach of the implied covenant of good faith and fair dealing under Utah law.  Simply put, LTX had no right or option to an extension of the deadline for the balloon payment, and the Court obviously cannot imply an express term that the parties did not agree to include.

  Furthermore, for the reasons discussed above, the alleged misstatement made on April 22, 2004, is hardly definite enough to support a claim that HFL somehow inhibited or destroyed LTX's right to enjoy the fruits of the Lease Agreement.  <u>See</u> <u>Brown v. Weis</u>, 871 P.2d 552, 564 (Utah App. 1994) (under the implied covenant of good faith and fair dealing, "each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract").  LTX, it is undisputed, had possession and use of the lease equipment at all times relevant to these events, i.e., it was receiving the fruits of the contract.  HFL's

12

alleged April 22, 2004 statement that it "could do something" to accommodate LTX's request for an extension, and HFL's subsequent attempt to collect late charges from LTX when an agreement for an extension was not reached by the parties, did not destroy or injure LTX's right to receive the fruits of the Lease Agreement. At most, HFL's conduct prevented LTX from receiving a benefit to which it was <u>not</u> entitled under the Agreement.

III. COUNTERCLAIM COUNT III, FOR VIOLATION OF MASS. GEN. LAWS CH. 93A, IS NOT COGNIZABLE UNDER THE LAW OF UTAH AND DOES NOT STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

Count III of the Counterclaim alleges that HFL's conduct violates Mass. Gen. Laws ch. 93A. This claim fails as a matter of law, for two reasons.

First, HFL's alleged conduct is clearly related to, and arises from, the terms of the Lease Agreement between the parties, and that Lease Agreement is governed by Utah law, not Massachusetts law. Thus, the Chapter 93A claim, a Massachusetts statutory claim, does not state a claim on which relief can be granted.

The scope of the choice of law provision contained in the Lease Agreement is to be determined by reference to Utah law, as all provisions of the Lease Agreement are to be construed in accordance with the laws of Utah. <u>See</u> Master Lease Agreement ¶ 18(d); <u>see also</u> <u>Jacobson v. Mailboxes Etc. U.S.A., Inc.</u>, 419 Mass. 572, 575 (1995) (holding, after determining that a forum selection clause is enforceable under Massachusetts law, that the law of the chosen jurisdiction would determine the effect of that clause). Utah law enforces choice of law agreements. <u>Prows v. Pinpoint Retail Sys., Inc.</u>, 868 P.2d 809, 810 (Utah 1993).

Furthermore, under Utah law, "when a tort or other claim is closely related to a contract with an express choice of law clause, in the absence of compelling reasons to the contrary, those closely related claims ought to be governed by the same law." See Unibase Systems, Inc. v. Professional Key Punch, 1987 U.S. Dist. LEXIS 16741, *17 (No. C86-213G) (D. Utah July 14,1987).

LTX's Chapter 93A claim is closely related to its Chapter 93A claim. Indeed, the claim is based in part on the same conduct alleged in the count for breach of the implied covenant of good faith and fair dealing which, by definition, is a contract claim. Furthermore, the misrepresentation claim also is closely related to the Lease Agreement, as the claim concerns an alleged proposal by LTX to extend the contractual deadline for the balloon payments. Such claims, therefore, are governed by the parties' agreement that Utah law applies to their relationship. Therefore, HFL has no claim for violation of a Massachusetts statute.[1]

Second, even if Massachusetts law applies to LTX's Chapter 93A claim, the claim should still be dismissed for failure to state a claim. The Chapter 93A claim is based on the same conduct alleged in the claims for breach of the implied covenant of good faith and fair dealing (Count I) and misrepresentation (Count II), and it fails as a matter of law for the same reasons these claims fail. Quite simply, the allegations against HFL do not come within the required "penumbra of some common-law, statutory, or other established concept of unfairness," nor do they set forth "immoral, unethical, oppressive,

---

[1] Massachusetts case law addressing the availability of Chapter 93A claims related to contracts governed by the law of other jurisdictions confirms the conclusion that a Chapter 93A claim is not available to LTX in the present action. In Mead Corp. v. Stevens Cabinets, Inc., for example, the court held that a choice-of-law clause selecting some state's law to govern "contract related" claims precludes a Chapter 93A claim when that claim essentially reduces to a contract claim. 938 F. Supp. 87, 90 (D. Mass. 1996). As previously mentioned, LTX relies upon the same facts to prove both its claim for breach of the covenant of good faith and fair dealing and its Chapter 93A claim.

or unscrupulous" conduct which might support a Chapter 93A claim.  See Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc., 403 Mass. 722, 729 (1989).  Even assuming the allegations in LTX's Counterclaim to be true, HFL is guilty of no more than giving a vague response to a request for an extension of a payment due date.  Such conduct cannot be the basis of a Chapter 93A claim.

## CONCLUSION

For these reasons, HFL respectfully requests that the Court dismiss LTX's Counterclaim in its entirety, pursuant to Rule 12(b)(6), Fed. R. Civ. P.

          HELLER FINANCIAL LEASING, INC.

          By its attorneys,

/s/ Dylan Sanders
C. Dylan Sanders (BBO #630668)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2613
(617) 406-6016 (telephone)
(617) 406-6116 (fax)

Dated:  January 14, 2005